# Constitutionality of Affording Reduced Postal Rates to Committees of the Major Political Parties

The Postal Service acted within its authority, under 39 U.S.C. § 3626 and other applicable statutes, when it limited special bulk third-class rates to committees of the major political parties.

An argument can be made that a differential postal rate subsidy is analogous to the differential public campaign financing restrictions upheld against constitutional challenge in *Buckley* v. *Valeo*, 424 U.S. 1 (1976); however, the subsidy differential at issue here is more problematic than the scheme held constitutional in *Buckley*, because it significantly burdens minor political parties without giving them any countervailing advantages.

An appropriations proviso that encourages a one-time administrative differential among political parties, and avowedly favors the major parties at the expense of all others, may be more difficult to justify than the statutory scheme upheld in *Buckley*, which was neutral in its long-term application.

January 4, 1980

## MEMORANDUM OPINION FOR
## THE POSTMASTER GENERAL

This responds to your letter to the Attorney General asking our advice concerning whether there is a failure of appropriations in FY 1980 for special third-class rates for political committees other than those of the major parties, and if so, whether an adjustment of rates by the Board of Governors under 39 U.S.C. § 3627 to provide higher rates for all other parties would raise serious constitutional questions. It is our understanding that at the Board's December meeting, it determined that a failure of appropriations had occurred, and adjusted the rates for parties other than the Republicans and Democrats to the regular commercial rate, producing a differential of 5.3 cents per letter-size piece. We concur that a failure of appropriations within the meaning of § 3627 has occurred. We conclude that the present rate differential between the major parties and others is not clearly unconstitutional, although it does raise a serious constitutional question.

### I. Relevant Statutory Provisions and Their Legislative History

In 1978, 39 U.S.C. § 3626 was amended by adding a new subsection (e), providing that third-class mail of a "qualified political committee" shall be charged the rates currently in effect for third-class mail of a

nonprofit organization. Pub. L. No. 95–593, 92 Stat. 2538. The amendment went on to define qualified political committees as national or state committees of "a political party." The effect of this provision was therefore to provide a substantial subsidy to political parties without discriminating among them.

The Postal Service Appropriation Act, 1980, Pub. L. No. 96–74, 93 Stat. 562 (1979), added a proviso to the general appropriation for the Postal Service:

> [p]rovided, that no funds appropriated herein shall be available for implementing special bulk third-class rates for "qualified political committees" authorized by Public Law 95–593, other than the National, State, or congressional committee of a major or minor party as defined in Public Law 92–178, as amended.

By referring to the definitions of the Presidential Election Campaign Fund Act of 1971, the proviso limited appropriations to use for reduced rates for parties receiving at least 5 percent of the popular vote in the preceding presidential election, a category that in application includes only the Democratic and Republican parties. *See* 26 U.S.C. § 9002 (6)(7).

The source of the proviso was a floor amendment to the Appropriations Act in the House of Representatives, *see* 125 Cong. Rec. H5888–96 (daily ed. July 13, 1979). Therefore, legislative history for it is limited to the colloquy on the floor that day. The amendment originated as a proviso blocking appropriations of special rates for all qualified political committees within the meaning of the 1978 legislation. Its purpose was the straightforward one of ending a major subsidy to political parties generally. The proposal sparked the immediate reaction that it was unfair to allow special rates for such nonprofit groups as special interest lobbyists, but to deny them to the major political parties. Accordingly, an amendment to the amendment was offered in order to preserve appropriations for the major parties. The technique was to use the definitions of the election financing law, in recognition that the effect of these definitions would be to allow appropriations for special rates for the Republicans and Democrats, but not for other parties. It was also made clear (after some confusion) that the effect of the proviso would not be directly to ban reduced rates for parties other than the major ones, but would be to trigger 39 U.S.C. § 3627, authorizing rate adjustments in response to failed appropriations, "so that the increased revenues received from the users of such class will equal the amount for that class that the Congress was to appropriate." Thus, it seems beyond serious question that a failure of appropriations within

the meaning of § 3627 has occurred.[1] In that event, the Postal Service is charged with deciding whether to adjust the rates in question.

In making an adjustment decision, the Service is enjoined by 39 U.S.C. § 403 not to "make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user." This general command to the Service does not provide a clear answer to the problem at hand. For example, since the Service has granted the nonprofit rate to the major parties, minor parties can complain of discrimination; if the Service had accorded all political committees the same rate, other users of the mails might have complained that the Service was subsidizing the fringe political parties at their expense. Therefore, the Service's rate classification seems to be within the bounds of reason. Moreover, 39 U.S.C. § 3621 requires the Service to set rates so that the mail pays its way in light of estimated costs, income, and appropriations. The present rate differential has that effect; it appears to be authorized.

## II. The Constitutionality of Postal Rate Differences Among Categories of Political Committees

Constitutional analysis must begin with *Buckley* v. *Valeo*, 424 U.S. 1 (1976), which upheld the constitutionality of the relevant provisions of the Federal Election Campaign Act of 1971. The statute had the present definitions of major and minor parties, along with a catchall category for "new parties," including all parties receiving less than 5 percent of the vote in the last election. 26 U.S.C. § 9002(8). The statute granted minor parties a ratio of the funds available to a major party depending on the ratio of their votes in the last election to those of the major parties. New parties would receive no money before the general election, but any candidate receiving 5 percent of the popular vote could receive post-election payments on the formula for the minor parties.

The Court upheld this part of the statute against an argument that it violated the equal protection principle of the Fifth Amendment. The Court began by reviewing its strict standard of review for direct restrictions on access to the electoral process, such as ballot qualifications.[2] The Court immediately distinguished the public financing provisions before it from the direct burdens on a candidate's ability to run for office in the ballot qualification cases, on the ground that public financing is less restrictive of access to the electoral process.

---

[1] *See also Association of American Publishers. Inc.* v. *Governors of U.S. Postal Service.* 485 F.2d 768, 776 (D.C. Cir. 1973).

[2] These restrictions require the presence of a "vital" governmental interest that is "achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity." 424 U.S. at 94.

337

Accordingly, it stated a somewhat weaker standard of review for such indirect political restrictions as public campaign financing:

> Congress enacted . . . [the statute] in furtherance of sufficiently important governmental interests and has not unfairly or unnecessarily burdened the political opportunity of any party or candidate.

424 U.S. at 95–96.

The Court was unmoved by the objections to the statute that minor parties receive less money than major ones, that new parties can receive only post-election funds, and that parties with less than 5 percent of the vote receive nothing. The Court emphasized that major parties suffer concomitant disadvantages in spending ceilings in return for public financing, and that minor parties remain free to raise money up to the spending limit for the major parties. The Court found sufficiently important governmental interests in eliminating the improper influence of large private contributions and in conserving public money through denial of funds to parties unable to demonstrate a modicum of support. At the same time, the Court thought that the statute did not unduly inhibit the opportunity of minor parties to become major ones if they could obtain enough private support.

The Court found the 5 percent threshold requirement for funding to be rational, citing *Jenness* v. *Fortson,* 403 U.S. 431 (1971), which upheld a requirement that candidates obtain signatures of 5 percent of eligible voters in order to be placed on the ballot. In *Jenness,* the Court had distinguished *Williams* v. *Rhodes,* 393 U.S. 23 (1968), in which the Court invalidated a set of Ohio restrictions on ballot access that made it very difficult for any party other than the Republicans and Democrats to reach the ballot. In discussing *Jenness,* the Court referred to threshold requirements as serving a public interest against providing "artificial inventives to 'splintered parties and unrestrained factionalism.' " Thus a respectable argument can be made that the postal rate differential is constitutional. Mail subsidies, like campaign financing, are expenditures of public money; *Buckley* allows reasonable classifications designed to protect the public fisc.

On the other hand, several factors make it more difficult to justify postal rate differentials than the campaign financing statute. First, there is no retroactivity provision by which a small party, by receiving 5 percent of the popular vote in the forthcoming election, can receive post-election funds. Second, there is no countervailing disadvantage for major parties, such as the campaign spending limits, in return for the postal rate subsidy they receive. Third, as *Buckley* emphasized, the campaign financing statute does not interfere with the capacity of small parties to become large ones through private fundraising, and perhaps even to qualify for federal campaign funds. In contrast, a postal rate differential directly impedes a major technique by which a small party

might attempt to increase popular support. Furthermore, postal rate disparity costs new parties relatively more money as the size of their mailings increases—the better they do, the more they are disadvantaged in comparison to the major parties. Thus it seems substantially more difficult to justify postal rate differentials than the campaign financing statute upheld in *Buckley*. It is also significant that, as shown by comparison of two of the ballot restriction cases, *Jenness* and *Williams,* the acceptability of particular restraints is a matter of degree. Large rate differentials are harder to justify than small ones.

One final topic deserves mention. In *Buckley,* the Court was reviewing the structure of a statute; here we are concerned with an appropriations proviso encouraging administrative differentials among parties. Although the Court in *Buckley* was aware that no minor parties would qualify in 1976, so that funds would be available only to Democrats and Republicans in that election, it was reviewing a statutory scheme that was neutral in its long-term application because it would remain available to third parties that might arise over time. That is not our situation. In the case at hand, because the statutory proviso is in an appropriation, it is effective only for this fiscal year, and an election year at that. The fact is inescapable that it fosters a one-time differential that would favor the major parties at the expense of all others.

In conclusion we believe that a respectable argument can be made that *Buckley* v. *Valeo* justifies a postal rate differential. Nevertheless, there is serious constitutional jeopardy in the present rate differential, which significantly burdens small parties in comparison to the major ones.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*
